PEOPLE v CUTLER

Docket No. 28493. Submitted June 7, 1978, at Lansing.—Decided
October 2, 1978. Leave to appeal denied, 406 Mich —.

Michael M. Cutler was convicted of two counts of involuntary
manslaughter in Washtenaw Circuit Court, Ross W. Campbell,
J. Defendant was involved in an accident with another automo-
bile in which two young people were killed. Following the
accident defendant was charged with driving under the influ-
ence of intoxicating liquors and was given a Breathalyzer test.
He was later charged with and tried for the two homicides.
There was a 37-month delay between defendant's arrest and his
trial. On appeal, defendant alleges that the trial court commit-
ted reversible error in admitting, over objection, evidence of the
Breathalyzer results and that he was denied his constitutional
right to a speedy trial. *Held:*

The results of Breathalyzer tests are inadmissible in a prose-
cution for manslaughter, but the error in admitting such
evidence is not an error so basic that it never can be regarded
as harmless beyond a reasonable doubt; therefore, a defendant's
conviction can be upheld where the evidence of his guilt is
overwhelming and where the Court of Appeals is convinced
that he still would have been convicted had the evidence been
excluded from the trial. A delay of 37 months between arrest
and trial did not violate the defendant's right to a speedy trial
where he caused or acquiesced in the delays, made no request
for a trial date and made no showing of prejudice from the
delay.

Affirmed.

REFERENCES FOR POINTS IN HEADNOTES

[1] 29 Am Jur 2d, Evidence § 830.

[2] 5 Am Jur 2d, Appeal and Error § 776.

[3, 4] 5 Am Jur 2d, Appeal and Error §§ 797, 798.

[5] 21 Am Jur 2d, Criminal Law §§ 241–243, 246, 247.
Accused's right to speedy trial under Federal Constitution—Su-
preme Court cases. 21 L Ed 2d 905.

[6] 21 Am Jur 2d, Criminal Law §§ 251–254.
Waiver or loss of accused's right to speedy trial. 57 ALR2d 302.
Accused's right to speedy trial under Federal Constitution—Su-
 preme Court cases. 21 L Ed 2d 905.

1. HOMICIDE—MANSLAUGHTER—EVIDENCE—BREATHALYZER TESTS—AD-
MISSIBILITY—STATUTES.

The results of a Breathalyzer test, administered pursuant to the
implied consent law, are inadmissible in a prosecution for
manslaughter (MCL 257.625c *et seq.;* MSA 9.2325[3] *et seq.).*

2. APPEAL AND ERROR—CRIMINAL LAW—HARMLESS ERROR—PREJU-
DICE.

The questions involved in determining whether a trial error
substantially prejudiced a defendant's right are (1) whether the
error was so offensive to the maintenance of a sound judicial
process that it never can be regarded harmless, and (2) if not so
basic, whether an appellate court can declare a belief that the
error was harmless beyond a reasonable doubt.

3. APPEAL AND ERROR—HOMICIDE—HARMLESS ERROR—BREATHALYZER
TESTS.

The admission of Breathalyzer results in a manslaughter prosecu-
tion is not an error so basic that it never can be regarded as
harmless beyond a reasonable doubt.

4. APPEAL AND ERROR—HOMICIDE—HARMLESS ERROR—BREATHALYZER
TESTS—ERRONEOUS ADMISSION—OVERWHELMING EVIDENCE.

Admission of Breathalyzer results in a prosecution for man-
slaughter is harmless beyond a resonable doubt where the
evidence of a defendant's guilt is overwhelming and where the
Court of Appeals is convinced that the defendant still would
have been convicted had such evidence been excluded from
trial.

5. CONSTITUTIONAL LAW—CRIMINAL LAW—SPEEDY TRIAL—BALANCING
TEST—FACTORS.

A balancing test is employed in attempting to resolve whether a
defendant's right to a speedy trial has been violated; the test
considers the following four factors: length of delay, the reason
for the delay, the defendant's assertion of his right, and preju-
dice to the defendant.

6. CONSTITUTIONAL LAW—CRIMINAL LAW—SPEEDY TRIAL—PREJUDICE.

A delay of 37 months between arrest and trial is not a violation
of a defendant's right to a speedy trial where the defendant
caused or acquiesced in a number of the delays, made no request
for a trial date and made no showing of prejudice from the
delay.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William F. Delhey,* Prosecuting Attorney, and *Robert L. Cooper,* First Assistant Prosecuting Attorney, for the people.

*Foley, Rasmusson & Emerson,* for defendant.

Before: Allen, P.J., and Cynar and D.R. Freeman,* JJ.

D.R. Freeman, J. Following a jury trial, defendant was convicted of two counts of involuntary manslaughter, MCL 750.321; MSA 28.553, sentenced to concurrent prison terms of 1-1/2 to 15 years and fined $1,500 on each count. He appeals as of right.

The record establishes that at about 11 p.m. on January 26, 1973, 16-year-old Warren Hoeman was the driver of a southbound car on Carpenter Road in Washtenaw County. His 18-year-old brother, Roy, and Roy's 14-year-old girlfriend, Susan Layton, were passengers in the auto. They were returning home from a drive-in movie.

Warren Hoeman testified that he saw a pair of headlights coming directly at him just after he crossed a freeway overpass on Carpenter Road; that he was in his own lane; that he yelled, "Look out!", and hit the brakes; that the next thing he remembered was waking up in a hospital.

Helen Hoeman, the mother of Warren and Roy, had also attended the drive-in movie in another car with two of her other children. She left the theater just a short time before Warren and Roy and proceeded south down Carpenter Road. Mrs. Hoeman testified that there was another southbound automobile ahead of her; that a northbound

---

* Circuit judge, sitting on the Court of Appeals by assignment.

car, a large car with a red roof, entered the southbound lane forcing that southbound auto off the road; and that the northbound car, as it approached her, likewise, forced her off the road.

Police officers who arrived at the scene at about 11:10 p.m. found Roy Hoeman and Susan Layton dead in the backseat of the car in which they had been riding, Warren Hoeman injured in the front seat and the Hoeman car demolished. They found defendant standing next to his car, a red Pontiac. His eyes were bloodshot and very watery; he was incoherent and unstable; his breath smelled of alcohol. There was blood on defendant's face and arm. When a police officer inquired as to his condition, he said that there was nothing wrong and denied that he was bleeding. He became belligerent and began to curse. At one point, for no apparent reason, defendant approached a police officer, stated that he was not involved in the accident and was not going to worry about it, and began to laugh. He appeared to the police officers to be highly intoxicated.

Defendant was arrested for DUIL.[1] He was first taken to a hospital. There he again became belligerent and profane. The doctor who examined him testified that he was intoxicated.

Defendant was then taken to jail where, at about 12:40 a.m., pursuant to MCL 257.625c *et seq.;* MSA 9.2325(3) *et seq.,* two Breathalyzer tests were administered. Both tests indicated a blood alcohol level of 0.18%.

Carpenter Road, at the scene of the accident, is a straight, two lane, north/south, paved road. There were no chuckholes or other obstructions in the road. The weather was clear at the time of the accident. The road was slightly damp, but not wet.

---

[1] MCL 257.625; MSA 9.2325.

Defendant, a grocery store butcher, left work between 3:30 and 4 p.m. on the day of the accident and proceeded to a bar where a number of the store's meat department employees were meeting to celebrate the promotion of a fellow employee. He remained at the bar until about 11 p.m. He was drinking mixed drinks, bourbon and coke. Defendant testified, at one point, that he drank six such drinks while at the bar and that it was unlikely that he had more; but, at another point, that he had one drink an hour for seven hours. Upon leaving the bar, he did not feel intoxicated. He entered his car and proceeded northbound on Carpenter Road. Defendant further testified that he did not at any time leave his lane and enter the southbound lane, or force any other car off the road; that he did not observe the Hoeman car approaching him, that it, in an instant, just appeared before him in his, the northbound, lane; that he did not remember anything from the time of the accident until he arrived at the jail.

Gary Fett, one of defendant's co-workers who was at the bar with the group of meat department employees between 3 p.m. and 8 or 9 p.m., testified that defendant had around eight drinks during that period; that the whole group was a little loud; that there was some slurring of speech; and that they talked about the same subject over and over. He believed defendant was affected by the alcohol he consumed.

Helen Whiting, the bartender until 10 p.m., testified that she served defendant six or seven drinks up until that time; that she sat at defendant's table from 10 p.m. until he left at about 11 p.m.; that he did not appear intoxicated.

Jeffrey Farnsworth, another of defendant's co-workers, was present at the gathering from about

3 p.m. until defendant left at 11 p.m. He testified that defendant did not appear intoxicated when he left.[2]

Lieutenant Leonard Dexter of the Washtenaw County Sheriff's Department was in charge of the investigation of the accident. The trial court ruled that he qualified as an expert in accident reconstruction. On the basis of the measurements, photographs and observations he made at the scene on the night of the accident, he testified that everything indicated that the collision occurred in the southbound lane.

Harold Sherman of the University of Michigan Safety Research Institute, on the basis of the measurements and photographs admitted in evidence, and on the basis of his observations made at the scene on the night of the accident, testified that the collision occurred in the southbound lane, that it could not have occurred in the northbound lane.[3]

Gerald Wieczorek, an accident investigator who testified on behalf of defendant, investigated the scene and the two vehicles involved nearly two weeks after the accident occurred. On the basis of the evidence admitted at trial and his observations, he testified that the collision occurred in the northbound lane. Although the trial court did permit Mr. Wieczorek's opinion testimony to go to the jury, it ruled outside the presence of the jury that he did not qualify as an expert in accident reconstruction.

---

[2] Three other of defendant's co-workers who were present at the bar also testified. However, as they all left the bar before, or by, 6 p.m., they could offer no testimony as to defendant's alcohol consumption later in the evening, or his condition at 11 p.m.

[3] We note that, although the trial court never expressly ruled that Mr. Sherman qualified as an expert in accident reconstruction, his opinion testimony was offered on the premise that he was an expert and defendant did not object to its admission on the ground that he was not so qualified.

Defendant raises eight issues on appeal, two of which merit discussion. He first contends that the trial court committed reversible error in admitting, over defendant's objection, evidence of the Breathalyzer results. The Breathalyzer tests were administered pursuant to MCL 257.625c *et seq.;* MSA 9.2325(3) *et seq.* There can be no doubt that the evidence of the results was inadmissible in this, a manslaughter, prosecution. *People v Keen,* 396 Mich 573; 242 NW2d 405 (1976).[4] The question becomes whether the error was so offensive to the maintenance of a sound judicial process that it never can be regarded harmless; and, if not so basic, whether we can declare a belief that the error was harmless beyond a reasonable doubt. *People v Robinson,* 386 Mich 551, 563; 194 NW2d 709 (1972). We have little difficulty in concluding that the admission of Breathalyzer results in a manslaughter prosecution is not an error so basic that it never can be regarded as harmless, and proceed to the second element of the harmless error test.

The probative value, and the impact on a jury, of scientific evidence such as Breathalyzer results cannot be gainsaid. This is especially so where, as here, the prosecutor, in closing argument, placed some emphasis on the Breathalyzer evidence; and the court, in its charge, instructed the jury that a 0.18% blood alcohol level gives rise to a legal presumption that the defendant was under the

[4] At the time of defendant's trial, such Breathalyzer results had been held admissible in a manslaughter prosecution. *People v Keen,* 56 Mich App 84; 223 NW2d 700 (1974). It was only after defendant's conviction that the Supreme Court reversed this Court and held to the contrary. *People v Keen,* 396 Mich 573; 242 NW2d 405 (1976). However, the Supreme Court's holding in *Keen* is retroactive. *People v Carter,* 78 Mich App 394, 398; 259 NW2d 883 (1977), *modified,* 402 Mich 851; 261 NW2d 182 (1978). *See, also, People v Weaver,* 74 Mich App 53; 253 NW2d 359 (1977).

influence of intoxicating liquor.[5] However, we have reviewed the record in this matter very carefully. The evidence against defendant is overwhelming. By his own admission, he consumed six or seven mixed drinks at the bar between about 4 p.m. and 11 p.m., the time of the accident. One of defendant's co-workers present at the bar testified that defendant was affected by the alcohol he consumed. There is credible testimony that he entered the southbound lane of Carpenter Road and forced two cars off the road before colliding with the Hoeman vehicle. The police officers who encountered defendant at the scene of the crime, and who, due to the nature of their work, have considerable experience in such matters, concluded that he was highly intoxicated. Defendant's bizzare behavior at the time provides ample substantiation of their conclusion. The doctor who examined defendant at the hospital concluded that he was intoxicated. Lieutenant Dexter, a qualified expert in accident reconstruction, arrived at the scene and gathered evidence and made his observations shortly after the mishap occurred. He concluded that all the evidence indicated that the collision occurred in the southbound lane. Mr. Sherman, who also was present at the scene shortly after the accident, reached the same conclusion. Only Mr. Wieczorek, who investigated the accident nearly two weeks after it occurred, and who the trial court ruled was not an expert in accident reconstruction, reached a contrary conclusion. On this record we can, and do, declare a belief that the erroneous admission of the Breathalyzer results was harmless beyond a reasonable doubt. Had that evidence been excluded, we are convinced that defendant would still have been convicted.

---

[5] *See* MCL 257.625a; MSA 9.2325(1).

Defendant also contends that he was denied his constitutional right to a speedy trial by the 37-month delay between his arrest and his trial.[6] The United States Supreme Court in *Barker v Wingo,* 407 US 514, 530; 92 S Ct 2182; 33 L Ed 2d 101 (1972), established the definitive test in this area:

"A balancing test necessarily compels courts to approach speedy trial cases on an *ad hoc* basis. * * * Though some might express them in different ways, we identify four such factors: Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." 407 US at 530.

To be sure, the delay in trying this case was considerable. All of the reasons for it do not appear in the record and it is difficult to apportion precisely the delay to the discernible causes. However, we do observe that defendant requested, caused or acquiesced in a number of the delays. A significant part of the delay must be charged to him. We also note that he filed some seven pretrial motions and an interlocutory appeal to this Court. We do not fault him for this, but it must be recognized that the judicial process requires a reasonable amount of time to dispose of such preliminary matters. Further, defendant at no time moved the lower court to fix a trial date. Rather, on February 17, 1976, less than two weeks before the trial was scheduled to begin, he filed a motion to dismiss for denial of his right to a speedy trial. While some may view this as shrewd trial "gamesmanship", we are singularly unimpressed with an allegation of error based on delay, where, as here, defense counsel showed markedly less concern with bringing the matter to trial than

---

[6] US Const, Am VI.

with contriving to build error into the record for purposes of appeal. See *People v Nuss,* 75 Mich App 346, 360; 254 NW2d 883 (1977) (Beasley, J., dissenting). In light of the facts that defendant has made no showing of prejudice from the delay,[7] and that our review of the record has revealed none,[8] we will not permit such a stratagem to prevail. Defendant was not denied his constitutional right to a speedy trial.

In sum, we find no reversible error.

Affirmed.

[7] On appeal, defendant has not even alleged prejudice. Rather, he relies exclusively on the doctrine that after an 18-month delay prejudice is presumed. *People v Grimmett,* 388 Mich 590, 606; 202 NW2d 278 (1972). Whatever the import of this rule, we do not believe that it precludes us from weighing heavily against defendant his failure to show even a reasonable possibility of actual prejudice. In fact, the Supreme Court did exactly that in *Grimmett.*

[8] Defendant in the case at bar was released on bond the day after the accident and has remained continuously at liberty to this date. Thus, he did not suffer oppressive pretrial incarceration. While recognizing that the extended pendency of serious criminal charges must have caused defendant some personal anxiety, we are dissuaded from according this factor great weight by his failure to move the trial court for an earlier trial date. Finally, we discern no way in which his defense was significantly impaired. If anything, the result of the delay was that the people's burden of proving guilt beyond a reasonable doubt was increased.